**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **VADA A. ROGERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:10-cv-0074** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Judge Thomas A. Wiseman, Jr.** |
| **COMMISSIONER OF SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Before the Court is Plaintiff Vada A. Roger's Motion for Judgment on the Administrative Record (Doc. No. 15), seeking judicial review of the Commissioner's denial of her claim for Social Security Disability Insurance Benefits ("DIB") payments under Title II of the Social Security Act (the "Act"), on the grounds that the ALJ's erred in rejecting the opinions of Plaintiff's treating physicians without adequately explaining his rationale for doing so, in evaluating Plaintiff's subjective complaints of pain, and in his consideration of the Vocational Expert's testimony. She seeks reversal or, in the alternative, remand pursuant to sentence four of 42 U.S.C. § 405(g). In response to the motion, the Defendant Commissioner of Social Security asserts that the agency's decision denying benefits is supported by substantial evidence in the record and should be upheld.

The prior referral of this case to the Magistrate Judge will be withdrawn. For the reasons explained herein, the Court finds that, while the ALJ's decision regarding the Plaintiff's residual functional capacity from approximately November 2007 forward is supported by substantial evidence in the record, and the ALJ's consideration of the opinions of Plaintiff's physicians and Plaintiff's credibility comported with applicable law, the ALJ's determination of Plaintiff's residual functional capacity for the period dating from her injury (August 15, 2006) through November 2007 is not supported by the record. In addition, the testimony of the VE does not appear to be consistent with the DOT, so remand for additional vocational testimony is required. Plaintiff's motion for remand pursuant to sentence four of 42 U.S.C. § 405(g) will

therefore be granted.[1]

## I.        BACKGROUND

### A.        Procedural history

Plaintiff applied for DIB on February 1, 2007, alleging disability due to high blood pressure, severe acid reflux, thyroid disease, bulging disc and herniated disc, and back and shoulder pain. (*See* Doc. No. 13, Certified Transcript of Administrative Record ("AR"), 131.) Her claims were denied initially and upon reconsideration. (AR 60, 61, 64, 69.) Upon Plaintiff's request, a hearing was conducted on July 21, 2009 by videoconference before Administrative Law Judge ("ALJ") Denise Pasvantis. The ALJ issued her decision denying Plaintiff's claim on November 30, 2009. (AR 11–28.) Plaintiff's request for review by the Appeals Council was denied on July 19, 2010 (AR 1–3), rendering the ALJ's decision the final decision of the Commissioner. Plaintiff filed this action on July 27, 2010, seeking review of that decision pursuant to 42 U.S.C. § 405(g).

### B.        Plaintiff's Age, Education and Work Experience

Plaintiff was born in 1964 and has a twelfth-grade education. She performed past relevant work as an assembler at Delbar Products in Crossville, Tennessee, where she worked for twenty-one years. She is married and has three children. She sustained a work-related injury to her right shoulder and low back on August 15, 2006 and alleges disability beginning August 16, 2006 due to "chronic low back pain, right shoulder pain, small apical infarct, very low ejection fraction, uncontrolled HTN [hypertension], chest pain, migraine headaches, hypothyroidism, arthritis, obstructive sleep apnea, anxiety and depression." (ECF No. 16, at 1.) Plaintiff has not worked since her alleged disability onset date of August 16, 2006. Her last-insured date for purposes of her DIB claim is December 31, 2011.

### C.        Plaintiff's Medical History

Prior to August 2006, Plaintiff had a history of cholecystitis, hypothyroid, hypertension, obesity, sleep apnea, and low back pain. She underwent a cholecystectomy by laparoscopy on June 15, 2006 (AR 229). However, her symptoms related to those conditions were under control and she was doing

---

[1]   The court notes that the parties have not addressed whether Plaintiff was covered by workers' compensation during that time period and what effect that coverage might have on her entitlement to DIB. Under 20 C.F.R. § 404.408, if Plaintiff is determined to have been disabled for a period of time and therefore entitled to benefits, the amount of money to which she may be entitled may be offset to the extent she is or was also receiving workers' compensation benefits for the same time period.

fairly well until she took a fall at work on August 15, 2006, injuring her right shoulder and low back. She reported her injuries and was treated at the Crossville Medical Group by Dr. Gary Morris, who diagnosed a lumbar strain and right shoulder contusion. She was released to return to work but with restrictions; specifically, she was directed to avoid lifting more than eight pounds with her right arm, and to avoid repetitive stooping, twisting or bending, prolonged standing or walking, and repetitive motions of the right shoulder. (AR 235.) Due to persistent pain in Plaintiff's right shoulder, Dr. Morris ordered an MRI on August 29, which revealed AC-joint hypertrophy with secondary spur formation and encroachment upon the rotator cuff muscle and tendon, and fluid in the subacromial bursa consistent with bursitis and peritendinitis. (AR 233.) Dr. Morris also noted "slow progress" with regard to the lumbar strain and that Plaintiff had only non-severe back pain with certain movements. He kept the same work-related restrictions in place but also noted that Plaintiff's employer was "unable to accommodate" the restrictions. (AR 237.)

Dr. Morris referred Plaintiff to Dr. Jeffrey Uzzle at Tennessee Orthopaedic Clinic for her low back pain. On September 6, 2006, Dr. Uzzle noted that Plaintiff reported the pain in her shoulder and back had improved about 50% since the initial injury. On examination, Plaintiff was observed to be moderately obese, with blood pressure at 130/80. She had normal range of motion in her back, however, with only "mildly" increased pain with extension and some radiation of pain into her hips. There was no tenderness on palpation and no muscle spasm; straight leg raise test ("SLR") was negative bilaterally. The right shoulder showed mild impingement signs and some stiffness, as well as tenderness to palpation of the subacromial bursa region and anterior shoulder. Dr. Uzzle ordered physical therapy and conservative care for her low back pain and shoulder, and modified her medications slightly. (AR 245–46.)

In November, Plaintiff reported physical therapy was helping her shoulder but not her back, and she was still experiencing low back pain radiating into the buttocks but no clear radiculopathy. Her blood pressure was normal. Dr. Uzzle referred her for an MRI of her lumbar spine. He also advanced her work restrictions to limit lifting to less than fifteen pounds. (AR 248.) The MRI showed degenerative disc disease L3-4 and L4-5 with loss of disc signal intensity at both levels and central subligamentous disc herniation at L3-4, and mild bulging at L4-5. (AR 239.) In December she reported she was "doing okay," though still experiencing intermittent low back pain without radiculopathy, and intermittent shoulder pain

and stiffness.  She was not working because the employer could not accommodate her restrictions.  Her medications at that time included hydrochlorothiazide, levothyroxine, Nexium, methocarbamol [muscle relaxant], Naproxyn, Ultram.  She had a negative SLR test, normal gait, normal lumbar range of motion except she was "mildly limited by pain at about 60 degrees in flexion."  (AR 249.)  She was still limited in her shoulder and had mild positive impingement signs.  Dr. Uzzle noted, with respect to Plaintiff's back pain, that she had chronic low back pain with "lumbar spondylosis superimposed on lumbar sprain taking long time to resolve."  He ordered a "work conditioning program," and continued work restrictions to no more than fifteen pounds lifting, and limited stooping, bending, and twisting to two times per hour, with no overhead work or overhead lifting.  (AR 249.)  He also noted that Plaintiff was thinking about applying for Social Security benefits.  The exam in early January was basically identical.  Dr. Uzzle reordered physical therapy and a work-conditioning program, and a functional capacity evaluation.  (AR 251.)

Dr. Uzzle referred Plaintiff to Dr. Brady for further treatment of her shoulder injury.  On January 19, 2007, Plaintiff reported to Dr. Brady that her shoulder pain had not improved since her injury.  (AR 252.)  On exam, the only objective sign was a "tremendously positive impingement sign" in the right shoulder.  He injected her shoulder in two places with DepoMedrol and Lidocaine and continued her work restrictions.  He repeated the injections on March 8, 2007.  On March 22, 2007, Dr. Brady noted she continued to have tremendous pain and had not responded well to conservative treatment.  Dr. Uzzle performed a right shoulder arthroscopy with subacromial decompression acromioplasty and arthroscopic distal clavicle excision on April 9, 2007.  She initially did well post-surgery and was started on physical therapy.

Plaintiff was referred to neurologist Dr. Joseph Jestus for continuing low back pain on March 20, 2007. She rated the pain as 4/10 and described it as aching, dull, and intermittent.  On examination, she had mildly reduced range of motion in her lumbar spine on extension and flexion and a negative SLR test bilaterally, normal paraspinal strength and muscle tone and normal neurologic exam.  She was diagnosed with lumbar region disc disorder and was not considered to be a surgical candidate.  (AR 462–63.)  Dr. Jestus reevaluated Plaintiff again on January 9, 2008 for continuing low back pain after sending her for a functional capacity evaluation.  On exam, she exhibited minimally decreased range of motion in her lumbar spine on flexion.  Dr. Jestus again diagnosed her with lumbar pain syndrome and assessed her as

being at maximum medical improvement. He indicated she should be permitted to return to work with "light physical demands" pursuant to the functional capacity evaluation, meaning she was limited to lifting twenty pounds occasionally and fifteen pounds frequently. (AR 465–67.)

Six weeks following her first shoulder surgery, on May 31, 2007, Dr. Brady noted Plaintiff had been doing physical therapy and "improving slowly." (AR 314.) He continued her on work restrictions, limiting her to pushing or pulling no more than twenty pounds, and limiting lifting to ten pounds. (AR 441.) In July 2007, three months post surgery, she continued to have significant pain in her shoulder and was not making much progress in physical therapy. Dr. Brady diagnosed post-operative adhesive capsulitis. He gave her another shoulder injection hoping it would help with the pain enough that she could work aggressively on physical therapy and continued her on the same work restrictions. Two weeks later, he noted she had "[w]orked very aggressively in PT" without improvement, and that Plaintiff wished to proceed with arthroscopic capsular release. (AR 312.) That procedure was performed on August 28, 2007, followed by more "aggressive" physical therapy. (AR 451.) She was noted to be doing significantly better as of October 22, 2007. At that time she rated the pain in her shoulder to be at 1/10 and noted she was beginning to return to normal activities. Dr. Brady noted that she should be able to return to work "regular duty" as of October 23, 2007, at least with respect to her shoulder. He removed lifting and range-of-motion restrictions and considered her to be at "maximum medical improvement" as of November 12, 2007, while nonetheless continuing Plaintiff on physical therapy. (AR 451–53.) Dr. Brady ascribed an eleven percent upper extremity impairment rating for workers' compensation purposes, and a seven percent whole-person impairment. He again noted Plaintiff could return to work without shoulder-related restrictions. (AR 454.)

Meanwhile, Plaintiff' saw her primary care physician, Dr. Jonathan Allred on June 22, 2007 complaining of general malaise. Her blood potassium was noted to be low (in fact, she had a history of low potassium), so he put her on potassium supplements. Dr. Allred rechecked Plaintiff's potassium a month later and took her off the potassium supplement. He also noted Plaintiff was complaining of anxiety, depression, numbness and tingling in the face and head. He added Paxil to her other medications, along with Micardis for blood pressure. (her (AR 330.) Her other medications were noted to include Flexeril, Ultram, Levothryoid, Nexium and Motrin. (AR 330–31.)

Otherwise, Plaintiff was complaining of chest pain during the spring of 2008. Radiologic and cardiovascular studies were essentially normal, though she was found to have a small apical infarct and mildly decreased ejection fraction. (AR 476; 677.) In May 2008 she presented to the ER complaining of headache, dizziness, dyspnea and swollen feet. Her blood pressure at the time was 143/60; lab studies were unremarkable except for elevated Troponin. A heart study revealed possible borderline cardiac enlargement based on a comparison with a prior study. (AR 593.) Ultrasound of carotid arteries showed no evidence of hemodynamically significant stenosis. (AR 594.) A CT scan of her head revealed no abnormality. (AR 595.) An EEG was normal. (AR 597.)

C.      RFCs and Consultative Examinations

Jerry Lee Surber, M.D., performed a consultative examination on April 23, 2007. Dr. Surber noted Plaintiff's history of low back and shoulder pain and a recent shoulder surgery, as well as mild obesity, hypertension, reflux disease, hypothyroidism, and shortness of breath upon minimal exertion with no chest pain. Plaintiff complained of pain, stiffness, fatigue, and headaches. Her medications included chewable calcium, Levothyroxine, Hydrocholothiazide, Nexium, Cyclobenzaprine, and Tramadol. (AR 296–97.) On examination, Plaintiff had blood pressure of 130/86, and bilateral pretibial and ankle edema. Dr. Surber was unable to assess Plaintiff's right shoulder mobility because of her recent surgery (just two weeks prior). He assessed her as able to lift or carry at least ten to fifteen pounds with the left hand. Based on her limping, antalgic gait, he limited Plaintiff to standing or walking for two to four hours if allowed to alternate sitting and standing and to use her non-dominant hand for lifting/carrying, and to sit for six to eight hours in an eight-hour work day. (AR 300–01.)

Agency consultant Michael N. Ryan, M.D., performed a residual functional capacity assessment based on his review of Plaintiff's medical records on May 31, 2007. (AR 302–09.) Dr. Ryan's assessment projected Plaintiff's abilities as of March 31, 2008, or basically twelve months after "onset," which he pegged to her recent shoulder surgery. Dr. Ryan opined that as of March 31, 2008, Plaintiff should be able to lift and carry twenty pounds occasionally and ten pounds frequently; and to stand and sit for approximately six hours each. She should be able to perform postural activities on an occasional basis but should never climb ropes, ladders or scaffolds and she would be limited to "frequent" pushing, pulling, and overhead work with her right arm but otherwise had unlimited ability to handle, finger, and

feel. Dr. Ryan noted that Plaintiff's symptoms were "credible now but are expected to improve and pain resolve with continued healing and appropriate medical and physical therapy." He also noted Plaintiff's treating source statement was on file and that is conclusions were not significantly different from those. (AR 307.)

Another physical residual functional capacity assessment was performed on November 26, 2007 by Dr. James Gregory, again assessing Plaintiff's abilities as of a future date, this time July 31, 2008 as approximately twelve months after her second shoulder surgery. (AR 433–40.) This RFC similarly limited Plaintiff to lifting twenty pounds occasionally, ten pounds frequently, standing or walking for six hours, sitting for six hours, with unlimited ability to push or pull, and ability to perform postural activities frequently, except for climbing ropes, ladders and scaffolds. Overhead reaching with her right arm was limited to frequent.

At treating neurologist Dr. Jestus's direction, occupational therapist Kitty Kittrell-Davis performed a functional capacity evaluation ("FCE") on November 27, 2007. In summary, Ms. Kittrell-Davis determined, based on Plaintiff's performance during this evaluation, that Plaintiff was capable of engaging in work at the "light" exertional level, meaning she demonstrated an ability to lift twenty pounds occasionally, ten pounds frequently, and a negligible amount of weight constantly, but that she would need to be able to change positions frequently and limit the amount of repetitive squatting, twisting, turning, and floor-to-waist lifting. (AR 706–07.) She could perform various postural activities, including stair climbing, repetitive or sustained squatting, kneeling, overhead reaching, on an occasional basis and could balance frequently. Ms. Kittrell-Davis concluded that Plaintiff could alternative between sitting, standing and walking for a total of eight hours per day with normal breaks. (AR 708.) According to the more detailed report, Plaintiff reported to the occupational therapist that she was independent with all activities of daily living, but she modified the way she did housework, and got her family to assist with heavy lifting. Plaintiff reported that she was "[m]ostly sedentary," doing little more around the house than "picking up" and grocery shopping. (AR 711.) On examination, Plaintiff was found to have slightly reduced range of motion in her spine, and she had a negative SLR best, both sitting and supine. (AR 711.)

Dr. Walter Wheelhouse, a board-certified orthopaedic surgeon, performed an independent

medical evaluation of Plaintiff on January 22, 2008, at her attorney's request. Dr. Wheelhouse's report indicates he reviewed Plaintiff's pertinent medical records and conducted his own medical examination. In the course of such examination, he found that Plaintiff had reduced range of motion in her lumbar spine, negative Waddell's signs, positive bilateral SLR test at 60 degrees sitting and 50 degrees supine, positive FABER sign bilaterally, as well as positive impingement sign and reduced range of motion in her right shoulder. According to Dr. Wheelhouse, Plaintiff needed to avoid reaching or lifting overhead or in an outstretched position with the right shoulder and arm, avoid lifting more than 10 pounds occasionally with her right shoulder and arm by her side, and avoid prolonged sitting, bending, stooping, lifting, twisting or turning. (AR 472.)

Plaintiff's treating primary care physician, Dr. Jonathan Allred, submitted a Medical Source Statement of Ability to do Work-Related Activities (Physical) dated April 2009. According to Dr. Allred, Plaintiff was limited to lifting no more than twenty pounds occasionally, and to standing or walking for less than two hours and sitting for less than six hours in an eight-hour work day. She had limited ability to push or pull with her upper or lower extremities, and could engage in postural activities—apparently including climbing ladders and scaffolds—on an occasional basis. The medical and clinical findings cited in support of this assessment included only "Chronic back pain with herniated disc" and "[c]hronic shoulder pain s/p [status post] Bilat[eral] shoulder [surgery]." (AR 702.) Dr. Allred also stated that Plaintiff had a "limited" ability in the areas of reaching as well as handling, fingering and feeling, but then noted that she was limited to performing these activities no more frequently than "constantly." (AR 727.)

D.    **Plaintiff's Testimony**

Plaintiff was represented by an attorney at the hearing conducted by videoconference on July 21, 2009 (with Plaintiff in Cookeville and the ALJ in Knoxville). Plaintiff testified that she was forty-four years old as of the date of the hearing, and that she had not worked or applied for work since August 2006. She is married and lives with her husband and three sons. Her husband is employed driving a truck. Plaintiff testified that she herself has a valid driver's license and drives approximately once a month. Her sister brought her to the hearing. She also testified that she was 5'4" and weighed 245 pounds.

Asked what kept her from working, Plaintiff testified that her biggest problem was pain in her right shoulder and low back, for which she takes Darvocet, 800 mg ibuprofen, and Flexeril. She rated her pain

at eight out of ten without medication, and a five or six out of ten with medication.  She claimed the medication helps alleviate the pain for six to eight hours at a time.  She testified that activity generally aggravates her symptoms.  She is also on medication for hypothyroid, Nexium for acid reflux, Avalide for high blood pressure, Paxil for anxiety, and oxygen at night for sleep apnea, as well as calcium and a multivitamin.  Plaintiff stated that she experiences side-effects associated with her medications including fatigue and drowsiness.  Her primary care physician, Dr. Jonathan Allred, prescribes all her medications.  Plaintiff testified that she had undergone physical therapy in the past, which seemed to help some.  She does not drink alcohol, smoke, or use drugs.

With respect to personal care, Plaintiff testified that she is able to bathe and dress herself but with some difficulty; in particular she has problems with bra clasps.  She cooks but "[n]ot as much as [she] did," but would still be able to make a sandwich and heat up soup in a microwave.  (AR 45.)  She can load dishes in the dishwasher, do laundry and fold clothes but slowly and "not every day."  (AR 45.)  She testified that she could sweep, but her husband or kids generally help with mopping and vacuuming.  She goes grocery shopping approximately once a week.  She also testified that she is "pretty isolated" and rarely visits friends or has company at her house.  (AR 45.)  Plaintiff stated that she does not read, play games, watch much television except for some news, go to church, travel, eat out, go to the movies, or travel.  She can write a check and pay bills.

On a typical day, according to Plaintiff, she wakes up between 7:30 and 8:00 and will "try to do a little work . . . around the house," which requires her to stop and rest often.  (AR 45–46.)  She typically does not eat anything until 12:00 or 1:00, and she spends the afternoon "[j]ust around the house . . . . Just piddling usually."  (AR 46.)

On questioning by her attorney, Plaintiff testified that she had worked for Delbar Products in Crossville for twenty-one years until she sustained an injury to her right shoulder and low back on August 16, 2006.  She ended up having two surgeries on her shoulder, as well as physical therapy, injections, and medication, but has never regained full use of her right arm. (AR 47.)  She testified that she is limited in reaching behind her back, out in front of her, and in raising her arm over her head, and has reduced strength in that arm.

Plaintiff also testified that she has a herniated disk in her low back, at L3-4, which causes muscle

spasms in her back or legs at least once a day, which is why she takes Flexeril.

With respect to her high blood pressure, Plaintiff testified that she had a documented heart attack in August 2007. She had an "ejection fraction of 39 percent." (AR 49.) As a result of the heart attack, her hypertension, and her hypothyroidism she experiences moderate fatigue throughout the day, most days, even though she takes medication for these conditions. Plaintiff asserted that her treating physician, Dr. Allred, has instructed her to keep her feet elevated because they swell due to her heart problems.

Plaintiff also testified about her problem with migraine headaches, which she experiences "[a]t least every other day." (AR 50.) To help control her headaches, she lies down with a cold rag on her forehead and "tr[ies] to keep things quiet as possible." (AR 50.) She lies down at least three or four times during the day because of the pain and lack of energy.

Prior to August 16, 2006, Plaintiff did not have a problem with depression or anxiety, but after her accident she was prescribed Paxil. She testified that Paxil does not make her "normal," but helps her get through the day. She also testified that she continues to suffer from panic attacks.

**E.      Vocational Testimony at the Hearing**

Anne B. Thomas, a vocational expert ("VE"), also testified at the hearing. The VE testified that her testimony was consistent with the Dictionary of Occupational Titles and that she was familiar with "the various source documents concerning job information listed in the regulations" and the unskilled jobs requiring various levels of exertion. (AR 53.) She stated she had reviewed the record regarding Plaintiff's work history, and characterized Plaintiff's past work as a material handler as heavy, semi-skilled work, and her work as a production assembler in the auto parts industry as medium unskilled work.

The ALJ asked the VE to presume a younger individual with a high school education and the same work history as Plaintiff, and the residual functional capacity to lift and/or carry fifteen pounds occasionally, to stand and/or walk two to four hours total in an eight-hour work day, to sit six to eight hours total in an eight-hour work day, to occasionally climb ladders, ropes, or scaffolds, frequently climb ramps or stairs, frequently balance, stoop, kneel, crouch or crawl, frequently use the right upper extremity to reach in all directions. The VE testified that with these limitations, the hypothetical claimant could not perform Plaintiff's past work and did not have any skills transferable to other work that would

accommodate the same limitations.

Asked whether the same individual could perform other work, the VE testified that there were sedentary, unskilled jobs that would accommodate the identified limitations, including the jobs of production assembler, production inspector, and production laborer, of which, combined there were 4,700 jobs in Tennessee and 258,000 in the United States.

The ALJ asked whether an individual under the restrictions identified by Dr. Walter Wheelhouse could perform Plaintiff's past work or any other work. These restrictions included no reaching or lifting overhead or in an outstretched position with the right shoulder and arm, no lifting more than ten pounds occasionally with the right arm and shoulder by the side, and no prolonged sitting, bending, stooping, lifting, twisting or turning. The VE stated that an individual with these limitations and Plaintiff's age, education and work history could not perform Plaintiff's past work or any other work.

Next, the ALJ asked the VE to assume an individual of Plaintiff's same age, education and work history, who was subject to the limitations identified by Dr. Allred, including lifting and/or carrying up to ten pounds occasionally, standing or walking less than two hours in an eight-hour work day, sitting less than two hours total in an eight-hour work day, limited pushing and pulling with the upper and lower extremities, occasionally performing postural activities including climbing, balancing, kneeling, crouching, crawling or stooping, and who had limited reaching in all directions, but unlimited ability to handle and finger. The VE noted that an individual with these limitations would be unable to work an eight-hour day, and that a restriction on lifting only ten pounds occasionally was less than the lifting required by jobs in the sedentary range. In other words, the person would not be able to perform Plaintiff's past work or any other work.

On questioning by the Plaintiff's attorney, the VE also testified that an individual with Plaintiff's age, education and work history, who had moderate to severe pain and moderate to severe fatigue and would be required to lie down during the day more than during standard breaks would not be able to perform any work.

After the hearing concluded, the ALJ submitted written interrogatories to the VE. The VE was asked to presume a hypothetical individual of the same age and with the same education and work history as Plaintiff, who was subject to the following limitations:

Assume further that this individual has the residual functional capacity (RFC) to perform light work as defined in 20 CFR 404.1567(b) . . . ; lifting twenty pounds occasionally, ten pounds frequently, and a negligible weight on a constant basis; occasionally lifting twenty pounds from the floor to the waist; occasionally lifting twenty pounds overhead; occasionally to frequently bilateral carrying twenty pounds; frequently changing her positions; limiting the amount of repetitive squatting, twisting, turning, and floor-to-waist lifting; occasionally climbing stairs, performing repetitive squatting and sustained squatting, kneeling, and reaching overhead; frequently balancing; alternating between sitting, standing, and walking during the eight-hour day; performing extremely repetitive actions with both feet.

(AR 189.)  The VE stated that this hypothetical individual could not perform Plaintiff's past work, but could perform other unskilled, light-level work that existed in the national economy, including the jobs of hand packer, DOT code 753.687.010 (5,500 jobs in Tennessee, 200,000 in the United States), production laborer, DOT code 222.687.010 (12,000 jobs in Tennessee, 360,000 in the United States, and production machine operator, DOT code 559.685.078 (6,000 jobs in Tennessee, 240,000 in the United States).  (AR 190.)  The ALJ averred that her testimony was consistent with the DOT and/or the SCO.

## II.    THE ALJ'S DECISION

In her decision dated November 30, 2009, the ALJ made the following specific findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.    The claimant has not engaged in substantial gainful activity since August 16, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following combination of severe impairments:  rotator cuff tendonitis, degenerative joint disease of the right shoulder, sleep apnea, mild obesity, hypertension, gastroesophageal refl[u]x disease, degenerative disc disease of the lumbar spine at L3-4 and L4-5, and status post capsular release of the right shoulder.  The claimant's anxiety, depression, and cysts of the breast are not severe because they do not affect her functioning on a day to day basis (20 CFR 404.1520(c)).

. . . .

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

. . . .

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) except she could lift twenty pounds occasionally, ten pounds frequently, and a negligible weight on a constant basis; occasionally lift twenty pounds from the floor to the waist; occasionally lift twenty pounds overhead; occasionally to frequently carry twenty pounds bilaterally; frequently change her positions; limit the amount of repetitive squatting, twisting, turning, and floor-to-waist lifting; occasionally climb stairs, perform repetitive squatting and sustained squatting, kneeling, and reaching overhead; frequently balance; alternate between sitting, standing, and walking during the

eight-hour day; and perform extremely repetitive functions with both feet.

6.      The claimant is unable to perform past relevant work (20 CFR 404.1565).

. . . .

7.      The claimant was born on July 25, 1964 and was 42 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date.

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.      The claimant has not been under a disability, as defined in the Social Security Act, from August 16, 2006 through the date of this decision (20 CFR 404.1520(g)).

(AR 13–27.)

## III.     APPLICABLE LEGAL STANDARDS

### A.     Standard of Review

In social security cases, the Commissioner determines whether a claimant is disabled within the meaning of the Social Security Act and therefore entitled to benefits. 42 U.S.C. § 405(h). This Court must affirm the Commissioner's conclusions absent a determination that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir.1997); 42 U.S.C. § 405(g). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978)

The substantial-evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). "The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding "even if there is substantial evidence in the record that would have supported an

opposite conclusion." *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).

**B.      The Social Security Act and Disability**

The central issue on appeal is whether substantial evidence supports the ALJ's determination that Plaintiff was not disabled during the relevant time period.  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*Id.* § 423(d)(2)(A).

In making a determination as to disability under the above definition, an ALJ is required to follow the five-step sequential evaluation set out in the Social Security Administration's regulations.  20 C.F.R. § 404.1520.  The burden of proof is on the claimant through the first four steps; the burden shifts to the Social Security Administration in step five.  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).  However, the claimant always bears the ultimate burden of proving that he or she is entitled to disability benefits.  20 C.F.R. § 404.1512(a).

Step one of the sequential process requires determining whether the claimant is engaging in substantial gainful activity.  If not, the inquiry moves to step two, which determines whether the claimant's impairments, individually or in combination are "severe."  If a severe impairment is found, step three asks whether the claimant's impairment meets or medically equals the requirements of any impairment in the Listing of Impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the claimant's impairment is not of listing-level severity, then step four asks whether the claimant has the residual functional capacity ("RFC") to perform past relevant work.  If the claimant shows that she cannot perform past relevant work because of impairments, the Social Security Administration, in step five, must then identify other jobs existing in significant numbers in the national economy that the claimant can perform.  20 C.F.R. §

404.1520(a)(4). If at any point it is determined that the claimant is or is not disabled, the inquiry stops. *Id.* For example, if the ALJ determines at step four that the claimant can perform past relevant work, the ALJ need not complete the sequential analysis. *See id.*

## IV.    LEGAL ANALYSIS

In her brief in support of her motion, Plaintiff asserts that the ALJ erred in (1) rejecting the opinions of Plaintiff's treating physician and consultative specialist Dr. Walter W. Wheelhouse without adequately explaining why; (2) evaluating Plaintiff's subjective complaints of pain; and (3) in relying on the opinion evidence of consultative examiner Dr. Jerry Lee Surber, who opined that Plaintiff needed a sit/stand option. With respect to this third argument, Plaintiff claims that Dr. Surber, whose assessment of Plaintiff's limitations the ALJ implicitly accepted, stated Plaintiff should be allowed to alternate between sitting and standing, but that the jobs identified by the VE were sedentary jobs that would not allow a sit/stand option. (ECF No. 16, at 7.)

As set forth herein, the Court finds that the ALJ's evaluation of Plaintiff's complaints and her determination regarding Plaintiff's functional capacity as of the date of Plaintiff's maximum medical improvement in approximately November 2007 are supported by substantial evidence in the record. The ALJ failed to consider Plaintiff's capacity for work during the time frame from August 15, 2006 through November 2007, however, which was longer than twelve months, or to consider whether there were jobs she could perform during that period. In addition, as discussed in greater detail below, the ALJ's determination regarding the jobs Plaintiff could perform after that date that would accommodate her limitations is not adequately supported.

### A.    The ALJ's Consideration of the Medical Evidence

In assessing the opinion of Plaintiff's treating physician, Dr. Allred, the ALJ itemized Dr. Allred's findings as to Plaintiff's residual functional capacity—that is, that she could lift and carry ten pounds occasionally, stand and walk for less than two hours out of an eight hour work day, could occasionally climb, balance, kneel, crouch, crawl, or stoop, and was limited in reaching in all directions, handling, fingering, and feeling. (AR 23 (citing Ex. 26F).) She then stated:

> The undersigned affords lesser weight to the opinion of Dr. Allred because his determinations are not completely supported by objective medical findings. Social Security Ruling 96-2p.

(AR 23.)

Social Security regulations require the agency to "give good reasons" for disregarding the medical opinion of a treating physician. 20 C.F.R. § 404.1527(d)(2). Medical opinions are defined as opinions about the nature and severity of an individual's impairment(s), 20 C.F.R. § 404.1527(a), and they are the only opinions that may be entitled to controlling weight. S.S.R. 96-2p, 1996 WL 374188 at *2. Such opinions must be "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques and "not inconsistent" with the other "substantial evidence" in the individual's case record. *Id.* If the Secretary rejects the medical opinion of a treating physician regarding the nature and severity of a claimant's complaints, she must articulate a good reason for doing so. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

If the opinion of Dr. Allred qualified as a medical opinion as defined in 20 C.F.R. § 404.1527(a), it is clear that the ALJ's terse rejection of it would not satisfy the requirement that she "give good reasons" for doing so. The problem with Dr. Allred's opinion, however, is that it consists of a form with certain boxes checked, and the only support offered for the limitations ascribed by Dr. Allred is through referencing Plaintiff's diagnoses which, in and of themselves, are not determinative of whether the symptoms caused by those conditions are disabling under the Social Security regulations. The Court finds that Dr. Allred's opinion, provided for purposes of this litigation, rendered by means of checking boxes and filling in blanks on a form regarding Plaintiff's ability to do work-related activities does not constitute a medical opinion entitled to substantial deference, particularly in light of the fact that Dr. Allred made no attempt to support his opinions with reference to the medical record or his own treatment notes. Dr. Allred is not a specialist, and there is no evidence that he actually treated the conditions that Plaintiff claims are disabling—namely her back and shoulder pain. Moreover, there is no evidence in the record that Dr. Allred ever discussed with Plaintiff or examined her with regard to her ability to perform work-related activities such as standing, walking, lifting, and using her upper or lower extremities for pushing and pulling. *Cf. Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (holding that the ALJ "permissibly rejected" three psychological evaluations "because they were check-off reports that did not contain any explanation of the bases of their conclusions"); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3rd Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence

at best."); *O'Leary v. Schweiker*, 710 F.2d 1334, 1341 (8th Cir. 1983) ("[W]hile these forms are admissible, they are entitled to little weight and do not constitute 'substantial evidence' on the record as a whole.").

In sum, because Dr. Allred's opinion does not qualify as substantial evidence to which any amount of deference is due, the Court concludes that the ALJ did not err in rejecting that opinion.

Plaintiff also complains that the ALJ erred in rejecting the opinion of Dr. Wheelhouse. Dr. Wheelhouse was not a treating source. Rather, he is an orthopaedic specialist who performed a consultative examination and reviewed Plaintiff's medical records. The ALJ rejected Dr. Wheelhouse's opinion with only slightly more explanation than she gave in rejecting Dr. Allred's assessment:

> The undersigned affords lesser weight to the opinion of Dr. Wheelhouse because his determinations are not completely supported by the objective medical findings. Treatment notes from other treating physician's [sic] of record indicate signs of improvement in the claimant's condition. Social Security Ruling 96-2p.

(AR 24.)

Because Dr. Wheelhouse was not a treating source, the ALJ did not owe his opinion any particular weight. Further, the ALJ is correct that Dr. Wheelhouse's opinion is not completely supported by the objective medical evidence and is inconsistent with the opinions of treating specialists, particularly Drs. Brady and Jestus, whose opinions are generally entitled to more weight. *See* 20 C.F.R. 416.927(d)(2). The Court finds that the ALJ did not err in according lesser weight to Dr. Wheelhouse's opinion.

In rejecting, at least in part, the opinions of Drs. Allred and Wheelhouse, the ALJ instead relied primarily upon the opinions of Dr. Brady and Dr. Surber regarding the degree to which Plaintiff was limited by her shoulder and back injuries. The specific record from Dr. Brady to which the ALJ referred is dated November 12, 2007. (AR 453 (Ex. 16F, at 13).) That day, Dr. Brady noted that Plaintiff had flexion of her right shoulder to 150 degrees, extension to 10 degrees, external rotation of 60 degrees, internal rotation of 30 degrees, abduction of 140 degrees, and adduction of 20 degrees. He stated: "Today I consider her at maximum medical improvement," and he assigned Plaintiff a seven percent whole-person impairment rating for workers' compensation purposes. (AR 453.) Dr. Surber's opinion was rendered on April 23, 2007, fourteen days after Plaintiff's first shoulder surgery, and Dr. Surber specifically indicated he was not able to assess Plaintiff's abilities in her right shoulder as a result. Otherwise, Dr. Surber assessed

Plaintiff as capable of lifting and carrying ten to fifteen pounds with her non-dominant left hand, standing and walking with normal breaks for up to two to four hours in an eight-hour work day, and sitting for up to six hours out of an eight-hour work day, provided that she was able to alternate between sitting and standing. (AR 299 (Ex. 11, at 5).) In other words, neither Dr. Brady nor Dr. Surber addressed Plaintiff's shoulder-related limitations during the time frame from the date of her injury up until the date Dr. Brady found her to be at maximum medical improvement, which did not occur until after she had undergone surgery on her right shoulder twice as well as long periods of extensive, aggressive physical therapy on that shoulder.

In short, although the ALJ's determination regarding Plaintiff's residual functional capacity dating from November 12, 2007 forward is supported by substantial evidence in the record, there is no evidence in the record to support a conclusion that Plaintiff was capable of performing work at the light level for the fifteen-month period prior to that date. The ALJ simply did not address Plaintiff's capabilities prior to her reaching maximum medical improvement, nor did she obtain vocational testimony regarding whether there would be work in the national or regional economy that a person with Plaintiff's specific vocational and physical abilities during that time frame could perform. *See* 42 U.S.C. § 423(d)(1)(A) (defining "disability" in the DIB context as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months").

**B.      The ALJ's Evaluation of Plaintiff's Credibility**

Plaintiff basically contends that the ALJ did not consider all relevant factors, or overemphasized other factors, in evaluating her credibility, in violation of 20 C.F.R. § 404.1529 as well as SSR 96-7p.

When assessing the credibility of an individual's statements, the ALJ must consider not only objective medical evidence, but also:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions to pain or other symptoms.

S.S.R. 96-7p (July 2, 1996).

An ALJ's finding on the claimant's credibility is to be accorded great weight and deference, since an ALJ is charged with the duty of observing a witness's demeanor and credibility. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). However, this determination of credibility must be supported by substantial evidence. *Id.* If he finds contradictions among medical reports, the claimant's testimony, and other evidence, an ALJ may discount a claimant's credibility to a certain degree. *Id.*

Plaintiff argues that the ALJ erred in discounting her credibility. In the ALJ's written opinion, the ALJ provided a fairly exhaustive account of Plaintiff's medical history and took note of Plaintiff's testimony regarding her daily activities, ability to care for her personal needs, and subjective complaints. She observed that Plaintiff's anxiety and depression appeared to have been triggered by Plaintiff's anticipation of undergoing surgery on her shoulder and not be a pre-existing mental condition; that physical therapy had improved the range of motion in her spine and shoulder; that Plaintiff's report of having had a heart attack was not supported by the evidence of record; that Plaintiff reported experiencing improvement in the symptoms in her right shoulder after undergoing surgery and was "able to resume her regular activities" (AR 23); and that Dr. Uzzle also reported improvement in her signs and symptoms after her second shoulder surgery. In light of all of this evidence, the ALJ noted simply:

> The undersigned determined that the claimant's testimony was not credible because the medical evidence of record does not support the claimant's testimony. The claimant's treating physicians . . . indicated that the claimant could return to light work and the state agency medical consultant opinions corroborated their opinions.

(AR 23.)

In light of the deference that must be accorded an ALJ's credibility determination, *see, e.g.*, *Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 928 (6th Cir. 1987), the Court finds that the record viewed as a whole supports the ALJ's conclusion that Plaintiff's testimony was not entirely credible regarding her abilities dating from November 2007 forward. However, the ALJ did not ask questions

about and did not assess Plaintiff's credibility regarding her physical capabilities prior to achieving maximum medical improvement in her shoulder, more than a year after her initial injury.

### C.    The ALJ's Reliance on the VE's Testimony

For the reasons set forth above, it is clear that additional consideration must be given to Plaintiff's functional capacity during the fifteen-month period prior to her achieving maximum medical improvement of her right shoulder.  Additional vocational testimony will likewise be required to determine whether there were jobs in the economy Plaintiff could have performed during that time frame, as the record establishes that Plaintiff was not capable of performing her past work during that period.

With respect to the time period dating from November 2007 forward, the ALJ determined, based on Plaintiff's RFC as of that time, that Plaintiff was not capable of performing her past relevant work. Accordingly, the burden of proof fell to the agency to establish that there were other jobs in the economy that Plaintiff could perform.  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

With an eye toward meeting that objective, the ALJ posed certain hypothetical situations to the VE during the hearing, but none of those hypotheticals was consistent with the RFC the ALJ ultimately assigned to the Plaintiff, specifically including a need to be able to change positions frequently and to alternate between sitting and standing.  The ALJ therefore submitted interrogatories to the VE after the hearing which did set out the RFC the ALJ had ascribed and inquired whether there were jobs in the economy that a person with those limitations could perform.  In addition, as required by SSR 00-4p, the ALJ inquired, in the interrogatories, about whether the VE's evidence was consistent with the DOT.  The VE responded that her testimony was consistent with the DOT and even provided DOT codes, but it is readily apparent that her testimony was not consistent with the DOT, and she did not explain the inconsistency.

Specifically, the VE identified the job of Hand Packer with DOT code 753.687-010.  That code is actually for the position "Clipper (Boot & Shoe)," and the DOT description of the job does not accord with that of Hand Packer, nor is it evident from the description whether a person with Plaintiff's abilities could perform the job.  Further, there is no single job titled "hand packer" that the Court can find in the DOT. The closest position is that of "Hand Packager," DOT code 920.587-018, but this job is classified as

medium work rather than light.

The second job identified by the VE is that of Production Laborer, DOT code 222.687-010. In fact, a search in the DOT for that code number pulls up the description for the position of "Checker I," which is a light job but otherwise the description of the job does not make it clear that it would accommodate Plaintiff's specific limitations.

The third job the VE identified is that of Production Machine Operator, DOT code 559.685-078. That DOT code is actually assigned to the position of "Foam Machine Operator," which is classified as medium work.

The VE has not explained the discrepancies between the DOT and her testimony regarding the ability of a person with Plaintiff's restrictions to perform these jobs. Because the VE's testimony was the only evidence at step five that the ALJ relied upon, the Court cannot find that there is substantial evidence in the record to support the ALJ's determination that there is a significant number of jobs in the national or regional economy that Plaintiff could perform. Remand is required in order for the ALJ to resolve the conflicts between the VE's testimony and the DOT, and to ascertain whether in fact there is work in the economy that Plaintiff can perform.

**V.      CONCLUSION**

Although the Court finds that the ALJ's determination of Plaintiff's residual functional capacity dating from November 2007 forward is supported by substantial evidence in the record, there is not sufficient evidence in the record to support the ALJ's implicit conclusion that Plaintiff had the same capacity from the date of her injury, August 15, 2006, up until November 2007. Additional proceedings to define Plaintiff's RFC during that time frame are needed, as well as consideration of whether there were jobs in the economy a person with Plaintiff's specific vocational abilities during that time frame could have performed.

In addition, the ALJ's reliance on the VE's testimony regarding jobs Plaintiff could have performed from November 2007 forward was in error in light of patent discrepancies between the VE's testimony and the DOT which were not explained by the VE.

For all these reasons, the Court will grant Plaintiff's motion for judgment reversing the ALJ's decision, and remanding for further proceedings consistent with this opinion.

An appropriate order will enter.

_____
Thomas A. Wiseman, Jr.
Senior U.S. District Judge